966 So.2d 337 (2007)
Allen COX, Appellant,
v.
STATE of Florida, Appellee.
Allen W. Cox, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC05-914, SC06-40.
Supreme Court of Florida.
July 5, 2007.
Rehearing Denied September 25, 2007.
*340 Bill Jennings, Capital Collateral Regional Counsel, David R. Gemmer and Marie-Louise Samuels Parmer, Assistant CCR Counsel, Middle District, Tampa, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Allen W. Cox appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851. He also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

FACTUAL AND PROCEDURAL HISTORY
Allen W. Cox was convicted of the first-degree murder of fellow inmate Thomas M. Baker, Jr. See Cox v. State, 819 So.2d 705, 710 (Fla.2002). In the opinion affirming Cox's conviction and sentence, we detailed the facts surrounding the murder:
On December 20, 1998, the appellant discovered that someone had broken into his personal footlocker and stolen approximately $500. Upon making this discovery, Cox walked out onto the balcony of his dorm and announced that he would give fifty dollars to anyone willing to identify the thief. He also indicated that when he discovered who had stolen from him, he would stab and kill that *341 person, and that he did not care about the consequences.
During the prison's lunch period on December 21, the appellant called Baker over to him, and then hit him with his fists to knock him down. During the attack, the victim continuously attempted to break free from Cox, and also denied stealing from him multiple times. At a lull in the beating, the appellant said, "This ain't good enough," and stabbed Baker with an icepick-shaped shank [n. 2] three times. After the stabbing, Appellant walked away stating, "It ain't over, I've got one more . . . to get." He then walked behind the prison pump house and hid the shiv in a pipe. Cox proceeded from the pump house to his dorm, where he encountered Donny Cox (unrelated to the appellant). There, Appellant questioned him about his stolen money and told him that if Cox had his money, he would kill him also. Following this exchange, the appellant returned to his cell, where he next attacked his cellmate, Lawrence Wood, advising him that Wood was "lucky I put it up, or I'd get [you]."
While the appellant was returning to his cell, the stabbing victim fled the attack scene and ran to corrections officers in a nearby building. The officers present at the time testified at trial that Baker had blood coming from his mouth, and that he was hysterically complaining that his lungs were filling with blood. Baker also responded to the prison officials' questions regarding who had attacked him by saying, "Big Al, Echo dorm, quad three." Although the corrections officers attempted to expedite emergency treatment of the victim by placing him on a stretcher and carrying him on foot to the prison medical center, Baker died before arriving at the hospital.
Doctor Janet Pillow testified that upon her autopsy of the victim, she found that the victim had been stabbed three times. Two of the wounds inflicted were shallow punctures of the lower torso, but the fatal wound had entered the victim's back and traveled through the chest cavity, between two ribs, and finally pierced the lungs and aorta. She testified that a conscious person with this wound would suffer from "air hunger," and would be aware of the "serious danger of dying." She described the wound as being approximately 17.5 centimeters deep, although only two millimeters wide. Doctor Pillow verified that the shank found by the pump house was consistent with the victim's injuries, despite the fact that the wound was deeper than the length of the weapon. She attributed the discrepancy between the length of the weapon and the depth of the wound to the elasticity of human tissue.
The appellant also testified, contending that all of the previous witnesses were correct, except that they had not seen what truly happened when he, Baker, and Vincent Maynard, a third inmate, were close together. According to Cox, it was he who had in fact dodged Baker and Maynard's attempts to stab him, and it was Maynard who actually stabbed Baker in the back accidentally. In Cox's version of the events, he had only struck the victim because he was defending himself from both of the other attacking men. Following the conclusion of the guilt phase testimony and argument, the jury deliberated, apparently rejected the view of the evidence offered by Cox, and found the appellant guilty of first-degree murder.
[n. 2] A "shank" or "shiv" is a homemade knife.
*342 Id. at 709-10.[1]
During the penalty phase, the State presented five witnesses who testified with regard to Cox's prior convictions. Mary Louise Hamilton and Michael Bishop testified that they each worked at a convenience store in Lebanon, Kentucky. Hamilton testified that in May of 1980 and February of 1981, Cox used a firearm to rob the store in which she was working. Michael Bishop was also present during the May 1980 robbery and testified about the event. Judith and Earl Turner provided testimony with regard to an incident which occurred during November 1989, in which Cox broke into their Margate, Florida, home and beat Earl with a three-hole punch. Finally, Bonnie Primeau testified that during October of 1989, Cox entered the store in which she was working at 2:30 a.m., dragged her out of the store, and pushed her over a cement wall, which caused a fractured pelvis. According to Primeau, Cox attempted to force her to perform oral sex, and then he attempted to sodomize her. When both attempts failed, Cox raped her vaginally.
Defense counsel presented the testimony of four witnesses and read the deposition testimony of Cox's father, Ray, to the jury.[2] Donald Johnson, an inmate housed with Cox at Lake Correctional Institution, testified that he and Cox were friends, and that Cox never bothered anyone before the incident with Baker. Cox's grandmother, Hazel Cox, established that Cox's parents were distant relatives, and that Cox had attempted suicide when he was fifteen years old. Cox came to live with her when he was approximately ten years old, and he lived with her for four or five years. During that period of time, he took care of her and obeyed her, and she never mistreated him.
Cox's sister, Elizabeth Veatch, testified with regard to the emotional and physical abuse suffered by herself and Cox at the hands of their mother, and that Cox was beaten more frequently by the mother because Cox looked like his father, Ray, and the mother disliked Ray. Veatch stated that when Cox was ten, his mother abandoned him on the road in front of his father's house. Finally, Veatch related that the maternal grandfather "went crazy" and was placed in an institution. The father, Ray Cox, described fights in which he was involved with Cox's mother, Barbara, in the presence of the children, and testified that when Barbara abandoned Cox in front of the father's house, she stated that she would kill Cox if he ever returned to her house. Ray further testified that when Cox was younger, he had been injured in a motorcycle accident and was not wearing a helmet at the time.
Finally, Dr. Elizabeth McMahon testified that she met with Cox for a total of thirteen hours. In addition, she interviewed Cox's mother, father, his two sisters, and his grandmother. She detailed the extensive list of documents she reviewed in evaluating Cox, which included Department of Corrections (DOC) medical records and notes, witness depositions, and a twenty-five page forensic assessment from the public defender's office that was completed by Cox. She also administered a battery of tests to Cox, including the Wechsler Adult Intelligence Scale, the Stroupe Color Word Test, the Memory *343 Assessment Scale, the Raised Complex Figure Test, the Wisconsin Card Sorting Test, the Minnesota Multi-Phasic Personality Inventory, the Rorschach Test, the Personality Disorder Questionnaire, the Projective Drawings and Hand Test, and the Trauma Symptom Inventory.
Dr. McMahon was of the opinion that Cox had a deficit with regard to visual memory. According to McMahon, the neurons connecting the area of his brain in control of visual memory to the frontal lobes, which control executive functions, were disrupted. McMahon believed the deficit to be mild, but concluded that Cox's brain is not one hundred percent functional. Cox appeared to have the most difficulty with being flexible in his thinking and the ability to shift his thinking process to move in another direction. She testified that Cox was legally sane, but suffered from chronic ongoing depression. The DOC medical records indicated that Cox suffered from antisocial personality disorder and alcohol dependence. According to McMahon, Cox did not see other people as trustworthy and, therefore, he had no positive feelings with regard to others. She testified that Cox was "by far one of the emptiest individuals I have ever seen in twenty-five years of doing evaluations." McMahon characterized his upbringing as "horrible," stating that the abuse suffered by Cox was neither consistent nor predictable. She stated that his parents were physically abusive toward him, and relied on an incident in which his father beat him with a two-by-four piece of wood. McMahon testified that Cox's inability to feel concern for or connect with others is a product of being raised in an environment where there was no trust or security, and Cox was told that he was worthless.
In rebuttal, the State presented the testimony of Dr. Michael Gutman, who was of the view that although Cox suffered from depression, the abuse that Cox suffered as a child toughened him so that he was able to survive in a difficult environment. As a result, he became a successful businessman in prison selling drugs. Gutman testified that he believed the killing of Baker was a business decision made by Cox to protect his money and his status in the prison as a drug dealer. Therefore, Gutman concluded that the abuse suffered by Cox during his childhood did not play a role in the killing of Baker. Gutman disagreed with Dr. McMahon's conclusion that Cox was an emotionally empty person with poor social skills. Gutman concluded after speaking with Cox that he was "smooth, and comfortable in talking, articulate, communicated well." To the extent that Cox might be shy, Gutman concluded that "he compensates for that by having a very positive on-stage personality."
On March 20, 2000, the jury returned a recommendation of death by a vote of ten to two. In sentencing Cox to death, the trial judge found four aggravating circumstances(1) previous conviction of a violent felony; (2) capital felony committed by person previously convicted of a felony and under sentence of imprisonment; (3) the capital felony was committed in a cold, calculated, and premeditated manner; and (4) the murder was heinous, atrocious, or cruel. See Cox, 819 So.2d at 710 n. 4. Although no statutory mitigation existed, the trial court found and weighed numerous nonstatutory mitigators as follows:
(1) severe domestic violence in Cox's childhood homeslight weight; (2) Cox's mother was very cruel and unpredictableslight weight; (3) Cox's mother was very cruel to the childrenslight weight; (4) frequently absent father who failed to protect Cox from mother's physical abuseslight weight; (5) Cox's mother was emotionally unstableslight weight; (6) Cox was forced to haul firewood *344 as a small child until he dropped from physical exhaustionslight weight; (7) Cox's parents divorced and remarried only to divorce againsome weight; (8) Cox has no happy memories from his childhoodslight weight; (9) Cox's mother abandoned him when he was eleven years old, forcing his father to send him to his grandmother's house for her to raisesome weight; (10) Cox was the frequent victim of inconsistent and unpredictable patterns of discipline as a childno separate weight; (11) Cox's mother failed to demonstrate any maternal affectionno additional weight; (12) Cox grew up feeling unwanted, unloved, and worthlessno additional weight; (13) Cox is able to form friendships slight weight; (14) Cox suffers from dysthymic disorder, a chronic depressive disorder unrelated to substance abuse; the disorder is amenable to treatment slight weight; (15) Appellant has been diagnosed additionally with adjustment disorder with depression; major depressive disorder, recurrent and severe; anti-social personality; alcohol dependence; and mixed personality disorderslight weight; (16) Cox has been on antidepressant medication since 1991no additional weight; (17) Cox suffers from severe depressionno additional weight; (18) Cox attempted suicide once in his youth and still has suicidal thoughtsslight weight; (19) Cox demonstrates brain impairment possibly from a head injury or a congenital birth defect or bothslight weight; (20) Cox's early childhood left him with feelings of hopelessness, insecurity, rejection, and inadequacyno additional weight; (21) Cox was severely injured in a motorcycle accident when he was sixteen rendering him unconsciousno additional weight; (22) Cox suffers from very rigid and repetitive thinkingno additional weight; (23) Cox is alienated and isolated and is distrustful of otherslittle weight; (24) Cox suffers from a severely impaired spectrum of emotional responsesslight weight; (25) as a result of his childhood, Cox has no sense of moral developmentno additional weight; (26) Cox's mental illness could have been treated and controlled with medication or counseling or bothno additional weight; (27) at the time of the offense, Cox's ability to exercise good judgment was impairedno additional weight; (28) Cox behaved well throughout these court proceedingssome weight; (29) Cox's moral development was similar to a retarded personno additional weight; (30) Cox is able to function and grow in prisonsome weight; (31) Cox is loved by his familyslight weight; and (32) Cox is a human beingno additional weight.
Id. at 710 n. 5.
On direct appeal, Cox presented the following issues: (1) the trial court erred in denying his motion for a mistrial based upon a discovery violation; (2) the trial court erred in denying his motion for a mistrial after a testimonial violation of court order in limine; (3) the trial court erred in ordering his penalty phase mental health expert to turn over her notes and testing materials to the State prior to trial; (4) the trial court erred in refusing to accept his offer to stipulate to his prior violent felony convictions; (5) the prosecutor's misstatements of the law and allegedly improper argument amounted to fundamental error; (6) the trial court erred by instructing the jury on the heinous, atrocious, or cruel aggravator and in finding that this aggravator was proven; (7) the trial court erred by instructing the jury on the cold, calculated, and premeditated aggravator and in finding that this aggravator was proven; (8) the trial court erred by failing to consider all available mitigating *345 evidence and in giving little weight to valid mitigation; (9) the death penalty is disproportionate in the instant case; and (10) Florida's death penalty scheme violates the Florida and United States Constitutions. See id. at 711 n. 6. This Court denied relief on all of his claims and upheld his conviction and sentence. See id. at 725.

MOTION FOR POSTCONVICTION RELIEF
On January 6, 2004, Cox filed a motion for postconviction relief raising five claims, two of which presented multiple subclaims.[3] On July 16, 2004, the trial court entered an order requiring an evidentiary hearing on claims I, II (in part), and III. After an evidentiary hearing was held, the trial court entered an order denying Cox's motion. This appeal followed.

I. Ineffectiveness of Trial Counsel
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that to establish ineffective assistance of counsel, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence *346 in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because each prong of the Strickland test presents mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla. 2004).
A strong presumption exists that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). In Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000), we concluded that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." It is under this legal framework that these claims of ineffectiveness of trial counsel will be addressed.

A. Ineffectiveness During Voir Dire
Cox contends that his trial counsel was ineffective during voir dire in failing to object to prosecutorial misstatements of the law, in failing to probe the jury panel as to several issues in death penalty litigation, such as mental health mitigation, and for questioning a juror in the presence of the entire panel with regard to her response on the jury form which stated "fry him," "once they get cooked they ain't gonna kill anyone else."
Prosecutorial Misstatements
On direct appeal, we concluded that on multiple occasions during voir dire the prosecution misrepresented the responsibility of the jury with regard to the weighing of the evidence in making a sentencing recommendation:
During jury selection, the prosecutor misstated Florida law by advising the prospective jurors that if "the evidence in aggravation outweighs the evidence in mitigation, the law says that you must recommend that Mr. Cox die." (Emphasis supplied.) The substance of this statement was repeated five times to the jury, four times during voir dire and once during closing argument. It is unmistakable that these statements are improper characterizations of Florida law regarding the weighing of mitigators and aggravators, as we have declared many times that "a jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors."
Cox, 819 So.2d at 717 (quoting Henyard v. State, 689 So.2d 239, 249-50 (Fla.1996)). We further noted that defense counsel failed to object to these misstatements. See id. Nonetheless, we ultimately held that the misstatements constituted harmless error:
Despite the lucidity of the law here, and the unavoidable conclusion that the prosecution's comments during Cox's trial were error, we hold that no fundamental *347 error occurred in the instant case. Fundamental error "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Kilgore v. State, 688 So.2d 895, 898 (Fla. 1996) (quoting State v. Delva, 575 So.2d 643, 644-45 (Fla.1991)). During voir dire, the prosecutor made the following additional statement:
Well, maybe I'm being a little too simplistic here. What the law says is that you need to weigh the evidence against and weigh it in the other direction, and depending upon which way it balances out, that is supposed to decide your recommendation. You're supposed to make your recommendation based on the weight. It's not worded that way, but that's a short rendition.
Also, the trial court did not repeat the prosecutor's misstatements of the law during its instruction of the juryindeed, the trial court's instructions properly informed the jury of its role under Florida law. Thus, the prosecutorial misrepresentation of the law was harmless error, and certainly does not constitute fundamental error.
Cox, 819 So.2d at 717-18.
We addressed the concept of fundamental error in our analysis on direct appeal because a claim of error that is not preserved by an objection during trial is procedurally barred on appeal unless it constitutes fundamental error. See F.B. v. State, 852 So.2d 226, 229 (Fla.2003). Trial counsel did not object to the statements of the prosecutor, and, therefore, the only way that Cox could obtain relief on this claim was if the misstatements constituted fundamental error. We concluded that they did not because the prosecutor later clarified the law, conceding that his prior statements had been overly "simplistic," and because the trial court read to the jury instructions that provided an accurate description of its role in reaching a recommendation. We reaffirm today our conclusion that the prosecutor's misstatements of the law did not constitute fundamental error because they did not "reach [ ] down into the validity of the trial itself to the extent that [the] . . . jury recommendation of death could not have been obtained without the assistance of the alleged error." Card v. State, 803 So.2d 613, 622 (Fla.2001).
In addition to holding that the prosecutor's misstatements were not fundamental error, we further concluded on direct appeal that even if the claim had been preserved, any error that occurred was harmless. This conclusion is fatal to Cox's claim in the instant proceeding that his trial counsel was ineffective for failing to object to these statements. The harmless error test as articulated by this Court requires the State "as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Thus, in concluding that the prosecutor's misstatements of the law during voir dire constituted harmless error, we held that there was no reasonable probability that these misstatements contributed to Cox's conviction. See id. Therefore, regardless of whether counsel was deficient for failing to object to improper statements by the prosecution, Cox cannot demonstrate prejudice under the second prong of Strickland. See Maxwell, 490 So.2d at 932 (stating that under the second prong of Strickland, "the clear, substantial deficiency shown must . . . be demonstrated to have so affected the fairness *348 and reliability of the proceeding that confidence in the outcome is undermined," and holding that "[a] court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied").
Despite our conclusion that Cox is not entitled to relief in this case, we do caution trial courts to be especially vigilant to ensure that prosecutors do not make inaccurate statements with regard to the law during voir dire.
Voir Dire by Defense Counsel
With regard to the failure to conduct individual voir dire of the juror who wrote "fry him" on her questionnaire, defense counsel William Stone admitted during the evidentiary hearing that it was not his preference to question some of the "extreme ultra-conservative" arguments expressed by certain jurors in the presence of the other jurors. In fact, the trial court record reveals that two motions were filed by defense counsel requesting individual juror voir dire. The first requested sequestered voir dire on certain topics, including juror opinions concerning the death penalty. In the second motion, counsel alleged in pertinent part that "[s]hould voir dire inquiry be conducted concerning the potential jurors' attitudes concerning the death penalty, individual and sequestered voir dire is necessary and collective voir dire inadequate to explore fully this sensitive and important issue." With regard to the first motion, the trial court reserved ruling on the portion of the motion requesting individual voir dire with regard to the juror attitudes toward the death penalty. The trial court explained at a pretrial hearing:
With regard to specific questions to specific jurors about the death penalty, I'm going to not tell you that I'm going to do it either way, other than to tell you that if we get an answer from someone that looks a little bit shaky in terms of what might be happening, we're going to stop and I'm going to leave it up to everybody, including me, to be paying close attention and we're going to stop with the questioning and . . . bring that juror up here. . . .
So, I'm not going to grant or deny [this portion of the motion], at this point in time, subject to what occurs during trial and we are all going to be on our toes to make sure that nothing untoward occurs.
The trial court then denied the second motion subject to its ruling on the first motion.
The trial transcript reveals that, in speaking to the juror in question (juror Gordon), counsel Stone was seeking clarification of her answers on her questionnaire based upon her responses to questions that had been posed by the State during voir dire:
COUNSEL: We really need some understanding of what your answer really is on this question because I read your questionnaire and you told Mr. Gross a minute ago, I can vote for life, then you said before that, it would have to be a solid case.
JUROR: Yes, if he was guilty and there was no evidence to prove otherwise, you know, I'd have to go for the death penalty really, because
COUNSEL: Okay. So that must mean what you meant in your questionnaire when it was asked whether you have feelings or opinions regarding the death penalty, and you wrote, "fry him," right?
JUROR: Yeah.
. . . .

*349 COUNSEL: Then you went on to clarify once they get cooked, they ain't going to kill anyone else, right.
JUROR: Right.
COUNSEL: Are there any of the rest of you that feel that way? Because it sounds to me like what Miss Gordon is saying is that if you are convicted of First Degree Murder . . . then you automatically get the death penalty.
JUROR: Yes.
Thus, counsel Stone, in referencing the "fry him" comment, was attempting to clarify juror Gordon's position with regard to the death penalty because her written answers on the questionnaire and her verbal statements during voir dire appeared to be inconsistent. Juror Gordon's responses to counsel Stone's questions were not inflammatory or aimed toward contaminating or intimidating the other members of the panel; rather, she concisely clarified her position with regard to the death penalty. We conclude that counsel's questioning of juror Gordon in the presence of the other jurors did not fall below a reasonable standard of care. See Johnson v. State, 903 So.2d 888, 897 (Fla.2005) ("A venire member's expression of an opinion before the entire panel is not normally considered sufficient to taint the remainder of the panel.").
With regard to the allegation that defense counsel failed to adequately probe the jury panel because too few questions were asked concerning mitigation and mental health issues, Cox does not elaborate upon or provide insight as to what questions counsel should have asked, or explain the inadequacy of the questions asked. Moreover, as noted by the trial court, Cox failed to allege in his postconviction motion or his argument how he was prejudiced by the allegedly incomplete voir dire or by the above exchange between counsel and juror Gordon in the presence of the other jurors. Accordingly, the instant claims are insufficient. See Waterhouse v. State, 792 So.2d 1176, 1181 n. 10 (Fla.2001) (concluding that ineffective assistance of counsel claim was insufficient where defendant failed to alleged how he was prejudiced by counsel's conduct).
In light of the foregoing, we conclude that the trial court properly rejected the assertion that counsel rendered ineffective assistance during voir dire.

B. Ineffectiveness During Opening Statements
Cox next contends that his trial counsel was ineffective during the opening statement because he conceded that Cox fatally stabbed Baker, and also due to the presentation of argument on defenses that are not recognized in Florida law.
Whether Counsel Conceded Guilt
The two relevant portions of the opening statement during which Cox contends that defense counsel conceded his guilt are as follows:
If there had been a guard there, quite possibly Venezuela[[4]] would have lived. The fight could have been broken up before it escalated to the point where Venezuela ended up dying.
As far as the medical care goes, Venezuela was able to get up, and if Venezuela was able to get up, given the difference in size between the two men, it's only because Allen [Cox] let him.
Having carefully reviewed counsel's opening statement, we conclude that it is clearly distinguishable from that of counsel during the trial of Joe Elton Nixon, which the United States Supreme Court determined to be an acknowledgement of Nixon's guilt: "In this case, there won't be any question, *350 none whatsoever, that my client, Joe Elton Nixon, caused Jeannie Bickner's death. . . . [T]hat fact will be proved to your satisfaction beyond any doubt." Florida v. Nixon, 543 U.S. 175, 182, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).
Unlike counsel in Nixon, counsel here specifically contended during his opening statement that the State would be unable to demonstrate beyond a reasonable doubt that Cox stabbed Baker:
In this particular case, the State will not be able to prove the case beyond a reasonable doubt, because what the evidence will show is that there is a lack of evidence.
[T]he evidence in this case will show that they don't have any videotape of this fight. . . . [T]hat will contribute to the State's lack of evidence and their inability to prove their case beyond a reasonable doubt.
Second, there is a lack of physical evidence connecting Allen Cox to the crime.
[Baker's and Cox's] clothes were sent off for analysis at FDLE, and those clothes came back with a little bit of Allen Cox's blood on Allen Cox's clothes, and a little bit of Thomas Baker's blood on Thomas Baker's clothes. We have a victim who bled to death and miraculously Allen Cox is clean as a whistle. And there is no blood at the scene.
Consequently, you have a lack of physical evidence. Take that lack of physical evidence and the lack of a videotape and there has to be a reasonable doubt beginning to grow in your mind.
Thus, unlike defense counsel in Nixon, counsel here never stated that Cox was responsible for Baker's death. Additionally, counsel did not relieve the State of its duty to demonstrate beyond a reasonable doubt that Cox killed Baker. Indeed, the gist of counsel's opening statement was the State could not meet the burden of proof required to convict Cox for the murder.
Moreover, the evidence presented during trial demonstrated that the defense theory of the case was that inmate Vincent "Pig" Maynard, not Cox, fatally stabbed Baker. During trial, Cox testified that when he and Baker began to fight, Cox saw Maynard running up to them with a knife in his hand. Cox testified that Maynard was "planning on sticking me, I seen it plain as day." According to Cox, the following occurred:
I take one step back. I got ahold of Baker's handas a matter of fact, I think both of our hands was on the knife, we were wrestling over the knife. When I backed up and pulled him with me, Pig's swing come around and stabbed him in the back. Pig is the one that stabbed Venezuela in the back.
During closing argument, defense counsel reiterated this testimony that it was Maynard (Pig) who had inflicted the fatal wound.
As the above testimony reflects, Cox admitted that he and Baker had been fighting during the time that the stabbing occurred. During the postconviction hearing, defense counsel explained that he made a strategic decision to concede during opening statements the fact that Baker and Cox had been fighting at the time of the stabbing because a large number of inmate witnesses were prepared to testify that such an altercation had occurred:
A lot of it had to do with the credibility of the people presenting the case, and to go in thereto go into that trialand say that, you know, that there wasn't a fight and our guy wasn't even in that prison at that time andI mean, you can onlya suspension of disbelief is a great thing for the movies. It's not so good for juries. So we have to dealwe *351 had to play the hand that we were dealt, and choose our battle, I guess, would be the best phrase.
Counsel testified that enough inmates had witnessed the fight that disputing the altercation during opening statement would have been detrimental to the credibility of the defense.[5]
In light of the foregoing, we conclude that defense counsel did not concede Cox's guilt during the opening statement. Further, to the extent that counsel conceded during the opening statement that an altercation had occurred between Cox and Baker, this was a reasoned strategic decision. See Occhicone, 768 So.2d at 1048 ("Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").
Ineffectiveness for Arguing Defenses Not Recognized in the Law
During opening statement, defense counsel made the following statements with regard to the care received by Baker after the stabbing:
Thomas Baker ran in and he said to Officer Parker, "I'm hit. I've been stabbed." . . . Officer Parker, the first thing she did, she picked up that phone and she called the medical emergency number and she heard the phone ring once, and then she heard the phone ring again, and again, and again after that. And the phone kept on ringing.
[T]hey have a rule. The rule is to get the inmate into medical treatment within three minutes of the call. And that didn't happen in this case. . . . That they sat there and waited for medical to respond, not three minutes, not four minutes, not five minutes, but as many as fifteen minutes.
So we're left to look at the poor medical care and what role that plays in . . . Baker's demise. . . . And because it could have changed the picture so drastically, it should leave you to wondering where the fault for this case lies. Whether or not this killing was premeditated as Mr. McCune and Mr. Gross would like you to believe.
After defense counsel concluded his opening statement, the State moved (outside the presence of the jury) to preclude the defense from cross-examining any witnesses or presenting any evidence with regard to the medical care that Baker received, asserting that the issue was legally irrelevant. When the trial court asked defense counsel to respond, counsel provided the following explanation:
[T]he standard of care or the care that Mr. Baker received goes to the issue of premeditation. This is not a situation . . . where we had many, many, many, stab wounds and Allen Cox should have known that Thomas Baker's death was likely to result.
In fact, if the State's theory is, and it, under a First Degree prosecution must be, is that Allen Cox's purpose was to kill Thomas Baker and that theory, that effort was abandoned by Allen Cox when he released Thomas Baker and Thomas Baker ran off to C dorm. Allen Cox didn't chase him. Allen Cox didn't beat him unconscious and did not stab him until he didn't move anymore.
The trial court ultimately agreed with the State that faulty medical care at the prison was not a valid defense. The trial court stated that it was "probably going to preclude [the defense] from arguing this at closing, but I believe that the law is clear *352 that I've got to give them wide latitude on cross-examination. . . . I'm making the Defense aware of my position that I don't think it's relevant either."
In the order denying postconviction relief, the trial court concluded that counsel's discussion of the medical care that Baker received constituted a reasoned strategic decision to attack the State's assertion that Cox had committed the crime with premeditation. The court also stated that counsel's argument "was an aspect of the case that could have blunted premeditation and provided `grist for consideration' should the jury ever consider penalty." In further concluding that defense counsel was not ineffective, the trial court noted that the faulty medical care claim was not the only argument submitted by counsel. Rather, defense counsel asserted that the State would not be able to prove its case against Cox beyond a reasonable doubt.
We agree with the trial court's determination that counsel's discussion of the faulty medical care received by Baker constituted a reasonable trial court strategy to attack the element of premeditation in the State's case. Counsel's primary defense strategy was to assert that inmate Vincent "Pig" Maynard fatally stabbed Baker. Nonetheless, even if the jury did not accept this strategy (which it did not, since Cox was convicted of the murder of Baker), the defense's assertion that Cox intended to stab Baker, but not to kill him, evidenced by Cox allowing Baker to run away after the stabbing, could have factored into the jury's weighing of whether to impose a life sentence or death.
In light of the foregoing, we conclude that counsel did not render ineffective assistance during opening statements.

C. Ineffectiveness During the Guilt Phase
In his next challenge, Cox contends that counsel was ineffective for failing to object to testimony given by the medical examiner during the guilt phase with regard to (1) the possibility of blood being wiped off the murder weapon, and (2) Baker's awareness of his imminent death. Cox contends that his counsel was further ineffective for the manner in which he questioned inmate Vincent "Pig" Maynard, which led this witness to reveal the prejudicial and inadmissible fact that Cox was serving two life sentences at the time of the murder of Baker. Finally, Cox contends that counsel was ineffective for failing to investigate evidence of a pattern of alleged threats and intimidation by State investigators against potential inmate defense witnesses. We address each challenge in turn.
Testimony by the Medical Examiner.
During trial, Dr. Janet Pillow provided the following testimony:
Q: Doctor, let's assume that the shank in the photograph was plunged into Mr. Baker's body and then drawn out through cloth, because of the lack of a significant amount of bleeding, is it possible that the cloth itself would wipe off the blood as the weapon is being pulled back out of the cloth?
A: That's possible but also because of the type of injury and the narrowness of the injury, stab wound, of the size of the skin, as the weapon, or whatever is being used, is drawn out of the body, by just the drawing out could wipe away any visible effects of blood, and certainly anything else that the blade might come through, whether it's cloth or any other substance, could also possibly wipe off the blood, if there were blood.
Q: So even though the weapon goes through a big blood vessel right off the heart, as it's being pulled out, the mechanical rubbing of the skin, could clean the blade of detectable blood?
A: Yes, sir.

*353 Q: And the cloth as well?
A: Correct.
Dr. Pillow also testified that it was "certainly possible" that a person who had experienced injuries similar to those suffered by Baker would recognize that he was "in serious danger of dying." Cox contends that counsel was ineffective for allowing the prosecution to elicit testimony from the medical examiner about mere possibilities of the victim's awareness of imminent death, and also for allowing Dr. Pillow to speculate as to whether the blood on the shank "could" have been wiped clean by drawing it out of the body and through cloth or fabric. Cox asserts that only when testifying as to the actual cause of death may a medical examiner expert testify with less than a reasonable degree of probability. Having considered these claims, we conclude that Cox is not entitled to relief.
During the postconviction hearing, defense counsel testified that he did not object to Dr. Pillow's testimony regarding the blood on the shank for two reasons. First, he believed Dr. Pillow's testimony fell within the realm of her qualified expertise. Second, it was the defense contention that the shank in evidence was not the one used to stab Baker and, because the shank in evidence did not have any DNA evidence on it, Dr. Pillow's testimony was not inconsistent with this theory of the defense. Counsel further reasoned that Dr. Pillow's theory that DNA evidence could be completely wiped off of a murder weapon was "preposterous" and "anybody else with walking-around sense would think the same thing . . . in this day and age of watching CSI."
With regard to the admissibility of expert testimony, this Court has stated:
Section 90.702 requires that before an expert may testify in the form of an opinion, two preliminary factual determinations must be made by the court under section 90.105. First, the court must determine whether the subject matter is proper for expert testimony, i.e., that it will assist the trier of fact in understanding the evidence or in determining a fact in issue. Second, the court must determine whether the witness is adequately qualified to express an opinion on the matter.
Terry v. State, 668 So.2d 954, 960 (Fla. 1996). This Court has further held that "trial courts have wide discretion concerning the admissibility of evidence and the range of subjects about which an expert can testify." McMullen v. State, 714 So.2d 368, 371 (Fla.1998). In the order denying relief, the trial court agreed that Dr. Pillow's opinions fell within the realm of her qualified expertise. The trial court proceeded to conclude that "trial counsel's objection to such testimony would have been futile. Trial counsel cannot be deemed ineffective for failing to object to admissible testimony."[6]
We conclude that even if defense counsel had objected to this opinion testimony, the trial court would not have abused its discretion in allowing this testimony. During trial, Dr. Pillow was qualified as an expert in forensic pathology. She testified that the shank in evidence was consistent with the type of weapon that caused the fatal injuries suffered by Baker. She testified that the depth of a victim's wound could be longer than the weapon itself based upon the force used and the sharpness of the weapon. She also testified that the width of an injury *354 could be broader than the width of the weapon based upon tissue elasticity. Given that Dr. Pillow was qualified to express an opinion on the effect of a weapon on a human tissue, it similarly was within her expertise to express an opinion as to the availability of DNA evidence or blood on that same weapon upon its extraction from human tissue. Accordingly, we conclude that this evidence was admissible at trial, and counsel was not ineffective for failing to object. See generally Gordon v. State, 863 So.2d 1215, 1223 (Fla.2003) ("Counsel cannot be deemed to be ineffective for failing to raise a motion that would have been futile."); see also Holland v. State, 916 So.2d 750, 758 (Fla.2005) (holding that trial counsel was not ineffective for failing to object to testimony that fell within the permissible range of ordinary police experience), cert. denied, 547 U.S. 1078, 126 S.Ct. 1790, 164 L.Ed.2d 531 (2006).
We further conclude that Cox was not prejudiced by the failure to object to Dr. Pillow's statement that it was "certainly possible" that a person who had experienced injuries similar to those suffered by Baker would recognize that he was "in serious danger of dying." In the postconviction order, the trial court detailed the substantial evidence supporting the conclusion that Baker was aware of his imminent death:
Captain Brack Johnson . . . testified that after the stabbing it was apparent that [Baker] was struggling, blood was trickling out of his mouth, and that he had stated his lungs were filling up with blood. Susan Parker testified that [Baker] was very scared and hysterical after the stabbing. She stated that [Baker] was coughing and spitting up from his mouth. Ms. Parker stated that she could tell he was getting worse and he was getting paler. Sergeant Joseph McBrayer testified that [Baker] was having trouble breathing and that [Baker] felt that his lungs were filling with blood.
Dr. Pillow testified during the autopsy that she found 1000 milliliters of blood free in the left chest cavity and 300 milliliters of blood free in the right cavity for a total of approximately 1.3 liters (or about one quart) of blood. Dr. Pillow said that the stab wounds would not have rendered [Baker] unconscious immediately and that the wounds would be painful and affect [his] ability to breathe. Finally, Dr. Pillow testified that [Baker] would feel his lungs fill with blood and he would have experienced air hunger.
Further, on direct appeal this Court, in approving the finding of the HAC aggravator, noted that "[a]n inmate witness testified that Baker said, `Ms. Parker, please don't let me die.'" Cox, 819 So.2d at 720.
Given this copious evidence through which the jury could have independently reached the conclusion that Baker was aware of his impending death, the failure to object to Dr. Pillow's testimony did not "so affect [] the fairness and reliability of the proceeding that confidence in the outcome is undermined." Maxwell, 490 So.2d at 932. In light of the foregoing, we affirm the trial court's denial of relief on this claim.
Cross-Examination of Inmate Maynard
On direct appeal, this Court described the circumstances surrounding inmate Maynard's revelation of the fact that Cox was serving two life sentences:
In preparation for the testimony of the witnesses to the appellant's "reward announcement," the trial court granted a defense motion in limine to preclude the State from introducing any evidence of the appellant's statement during his proclamation that he did not care about the consequences of killing the thief, because he was already serving two life *355 sentences. To ensure compliance with the order, the court instructed the State to inform all of its witnesses of the ruling, and the court also did so before each of them testified. All of the State's witnesses complied with the order.
During the defense case-in-chief, the appellant's attorneys elicited the testimony of Vincent Maynard, another LCI inmate. After an initial period of neutral direct examination, the defense began to explicitly attempt to blame Maynard for the death of the victim. The defense proffered reverse Williams rule evidence of Maynard's prior crimes, and started to question him in an openly hostile manner, resulting in an argumentative exchange of questions and answers between the examining attorney and witness. Not long after direct examination in the presence of the jury commenced, Maynard responded to a wholly unrelated but hostile line of questioning by saying, "Sir, he has two life sentences already." The defense moved for a mistrial, however, the court denied this motion and gave the following curative instruction:
Ladies and gentlemen, you are instructed that the sentence that Mr. Cox was serving at Lake Correctional Institution is not relevant to this case in any way. He has never been convicted nor is he serving any sentence for homicide or any type of murder.
Cox, 819 So.2d at 713 (footnote omitted). This Court ultimately concluded that the trial court did not abuse its discretion in denying defense counsel's motion for a mistrial:
In the instant case, the fact that Cox was serving two life sentences was certainly not critical to the State's case, and was not related to its theoriesthe jury already knew that he was an inmate at the Lake Correctional Institution where the events occurred. Additionally, defense counsel knew and assumed the risks of argumentatively questioning an openly hostile witness, and chose to do so in an extraordinarily combative manner. While the defense may have been chagrined that the jury was informed that the appellant was serving two life sentences due to the defense strategy, this information did not "vitiate the entire trial." Duest v. State, 462 So.2d 446, 448 (Fla.1985). Therefore, a mistrial was not proper. The trial court properly addressed the situation presented by giving the jury a proper curative instruction and proceeding with the trial.
Id. at 714 (citations and parenthetical omitted).
In the instant case, Cox contends that defense counsel was ineffective for questioning Maynard in a manner that led to the introduction of the evidence that Cox was serving two life sentences. During the postconviction hearing, defense counsel testified that he anticipated Maynard would be a hostile witness because the defense theory was that Maynard actually killed Baker. The defense strategy was to convey to the jurors through Maynard's demeanor at trial and his prior criminal history that he had the propensity to commit the murder. While defense counsel disputed that he questioned Maynard in an openly hostile manner, he acknowledged that "some of the questions might have been uncomfortable to Mr. Maynard, and that was the idea behind calling him as a witness and the idea behind the line of questioning." The attorney testified that as a result of this strategy, "we elicited every bit of testimony, emotion, reaction, demonstrative exhibits, anything that you want from Maynard, Pig, that we wanted and anticipated, except when he blurted out . . . about the life sentences." According to counsel, Maynard's revelation of the *356 two life sentences "wasn't responsive to anything I said to him at all."
Cox has failed to demonstrate that his counsel was deficient in the manner in which he questioned Maynard. The defense strategy was to demonstrate "to the jury as thoroughly as possible that this guy had the propensity to [kill Baker] and he was a nasty guy." In the order denying relief, the trial court concluded that "trial counsel had a duty to aggressively question Mr. Maynard," and that, had trial counsel failed to do so, "post-conviction counsel could argue that trial counsel was ineffective for failing to aggressively question Mr. Maynard. . . . [T]he record bears out that Mr. Maynard had to be repeatedly admonished during his testimony." Having reviewed the trial transcripts, we conclude that defense counsel cannot be faulted for the revelation of prejudicial information in testimony that was nonresponsive to a question propounded,[7] and where the trial court explicitly instructed Maynard to only answer the questions asked.[8]
Nonetheless, even if we were to conclude that counsel was deficient in the manner in which he questioned Maynard, Cox cannot demonstrate that he was prejudiced by this deficiency. As noted by this Court on direct appeal, the trial court gave a curative instruction to the jurors informing them that the life sentences being served by Cox were not for any type of murder or homicide. See Cox, 819 So.2d at 713. Further, the jurors were aware that the killing of Baker occurred in a prison and Cox was an inmate in that prison. See id. at 714. Finally, Cox himself testified at trial that he had been convicted of twelve prior felonies. Thus, because the trial court provided a curative instruction and there was independent evidence presented at trial establishing that Cox was a convicted felon with an extensive criminal history, Cox cannot demonstrate that he suffered prejudice as a result of counsel's performance.
Accordingly, we affirm the trial court's denial of this claim.
Testimony Regarding Threats and Intimidation
Cox next alleges that his trial counsel was ineffective in failing to present witnesses who could testify with regard to an alleged pattern of threats and intimidation by DOC employees against inmates who could have potentially assisted Cox in his defense against the murder charge. However, we reject this claim because Cox has failed to demonstrate that such a pattern actually existed.
During the postconviction hearing, the sole witness presented to testify with regard *357 to this issue was former inmate Henry Wheeler. According to Wheeler, DOC Inspector Kenneth Williams insinuated to him that "life could be a living hell for me if I helped . . . Cox in any way." Further, Wheeler said that Inspector Williams repeatedly mentioned Washington Correctional Institution, a prison with an unfavorable reputation that was a great distance from where Wheeler's family lived. Wheeler perceived Inspector Williams's repeated references to this institution to be an implied threat; i.e., that if Wheeler assisted Cox, he would be transferred there. Wheeler testified that after he told Inspector Williams that he would not assist in the defense, he was transferred to Brevard Correctional Institution, which, according to Wheeler, is a nicer prison with air conditioning. Wheeler additionally testified that when he was released from prison and placed on conditional release, defense counsel contacted him to testify at the underlying trial. According to Wheeler, parole officer Tanya Folsom summoned him and told him that he was still under the guardianship of DOC, and "they can make things rough on you." According to Wheeler, Folsom made it clear that he was to "stay out of it." Wheeler subsequently informed defense counsel that he had nothing to say. See id.
In response to Wheeler's testimony, the State called Inspector Williams and Ms. Folsom. Both testified that they had not threatened Wheeler with negative repercussions if he assisted Cox. According to Ms. Folsom, Wheeler advised her that he had been subpoenaed, and that if Cox was convicted, he would be called as a witness. Folsom told him that traveling to testify would be approved as long as Wheeler gave her a copy of the subpoena. According to Folsom, Wheeler called her later and informed her that he was not required to attend the hearing.
Inspector Williams testified that he had no involvement with Wheeler's transfer to Brevard Correctional Institution and did not know why he was transferred there. He stated that he never used the transfer process as a reward for inmates. Prior to Baker's murder and while Wheeler was incarcerated in Lake Correctional Institution, Williams investigated Wheeler for possible violations of Florida law and DOC regulations. In brief, Inspector Williams believed that Wheeler was bringing drugs into the prison compound because his work duty authorized him to go beyond the prison fence. As a result of an investigation, contraband was confiscated, Wheeler was placed in confinement, and his access to areas beyond the prison fence was terminated.
The trial court concluded that Cox had failed to demonstrate a pattern of threats and intimidation by DOC employees against inmates because (1) Cox had only presented the testimony of one individual, Wheeler; (2) Wheeler's testimony was contradicted by Inspector Williams and Ms. Folsom; (3) Wheeler has numerous felony convictions;[9] and (4) Wheeler had a personal reason to dislike Williams. The trial court ultimately concluded that Wheeler was not a credible witness. This Court "recognize[s] and honor[s] the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact. The deference that appellate courts afford findings of fact based on competent, substantial evidence is an important principle of appellate review. In many instances, the trial court is in a superior position `to evaluate and weigh *358 the testimony and evidence based upon its observation of the bearing, demeanor, and credibility of the witnesses.'" Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999) (quoting Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976)). In the proceedings below, the trial court reviewed the conflicting testimony of Wheeler, Inspector Williams, and Ms. Folsom, observed the demeanor of these witnesses, and concluded that Wheeler's testimony was not credible. We defer to the trial court's assessment of credibility and affirm its determination that Cox has failed to demonstrate a pattern of threats and intimidation against the inmates of Lake Correctional Institution.

D. Ineffectiveness During the Penalty Phase
Cox next asserts that counsel was ineffective for failing to conduct an adequate investigation into mitigating evidence. According to Cox, defense counsel did not begin the investigation into potential mitigation until shortly before the trial date. Cox asserts that counsel did not talk to any family members until the deposition of Hazel Cox, which occurred on February 23, 2000, less than two weeks before his trial began. Further, only five days before trial, defense counsel informed the court that their expert had found no statutory mitigators. Cox argues that a complete investigation would have revealed information that would have added to the weight of the existing mitigating circumstances, provided additional mitigation, and provided evidence necessary for the completion of a valid expert mental health evaluation.[10]
Testimony at the Evidentiary Hearing
During the evidentiary hearing, the second wife of Cox's father testified that before Cox's mother abandoned him at their house, she would see bruises on him from beatings administered by the mother. She also testified that Cox's father would beat her in front of Cox and her own children. She testified that when Cox eventually began living with his grandmother, Hazel, she failed to supervise him. As a result, when bad things happened, Cox would be blamed, regardless of whether he was actually responsible.
Cathy Null, another sister of Cox, testified about an incident where the father was holding the mother on the ground while she was pregnant, and Cox picked up a rock and said, "Get off my mama, or I'm going to kill you." She testified that she saw the father punch Cox while he was *359 handcuffed in the back of a police car, and the officers failed to intervene. She also testified that the grandmother was very lenient with Cox, and described one occasion in which Cox hid from the police in his grandmother's house and the sister was told that she must not disclose the location of Cox.
Cox's father testified that when defense counsel visited Kentucky, he accompanied the attorney to a tavern to speak with Cox's friends. According to the father, the attorney became drunk and required assistance to return to his hotel room.[11] The father did not say anything at the time of Cox's trial because he did not want the attorney to encounter trouble because counsel was attempting to help his son. The father related that counsel was in Kentucky for approximately two weeks, but only became intoxicated on that one occasion. With regard to background information, the father described an incident in which Cox was slammed into a tree by a mule while logging.
Dr. Robert Berland evaluated Cox to determine whether there was significant mitigation applicable to Cox that was not presented during trial. Berland interviewed Cox and talked to a number of lay witnesses, including family members and ex-girlfriends. In addition, Dr. Berland relied on prior psychological testing of Cox performed by DOC in 1990 and 1991, and reviewed documents, including interviews conducted by the Capital Collateral Regional Counsel (CCRC) investigator and available past medical records. Based on this information, Berland concluded that at the time of the murder, Cox was under the influence of an extreme mental or emotional disturbance. Dr. Berland concluded that Cox has suffered from a psychotic disturbance from his pre-teen years, which continues to the present time. According to Dr. Berland, the 1990 and 1991 DOC testing of Cox revealed that he was "someone who was trying very hard to hide his mental illness and wasn't trying to flaunt it." Berland also accepted the self-reporting of symptoms as credible because Cox admitted some symptoms but denied others, and "[t]he fakers . . . will routinely admit to all symptoms about which they are asked."
Dr. Berland testified that Cox suffers from hallucinations, delusional thinking, loose thought association, and endogenous mood disturbance, which is characterized by excessive sleep, suicidal thinking, deterioration in grooming, and episodes of manic disturbance. Berland discovered this evidence from Cox himself, who stated that he had experienced hallucinations and delusional paranoid thinking, and a large number of lay witnesses, whose various reports of the behavior of Cox coincided. According to witness reports, Cox was paranoid and irrationally jealous, he would talk to himself, and he would stare off into space for long periods of time. Dr. Berland was of the opinion that these symptoms likely intensified as a result of head injuries that Cox suffered (1) as a result of a motorcycle accident, (2) when he was slammed into a tree by a mule and knocked unconscious for several hours, and (3) when he was struck in the head with a bottle at approximately age eleven.
Dr. Berland testified that the psychotic paranoia would lead Cox to overreact to a potentially harmful event. Therefore, although Berland did not believe that a specific delusion led Cox to murder Baker, he said it would be "shocking" if paranoid thinking did not play a role in the crime. Berland further opined that this mental illness involuntarily impacted Cox in his perceptions and his behavior. Therefore, *360 while Berland found no evidence that Cox could not appreciate the criminality of his conduct, he concluded that Cox had a substantially impaired ability to conform his conduct to the law. With regard to nonstatutory mitigation, Dr. Berland referred to drug and alcohol abuse because both Cox and lay witnesses reported that he consumed alcohol and that he used cocaine, marijuana, and LSD. Berland discussed the unstable upbringing in circumstances where Cox's father, Ray, beat his stepmother, Betty, in his presence, and that his grandmother, Hazel, failed to supervise or discipline him. Finally, Dr. Berland noted that Cox's parents were biologically related, and that there was "an enormous amount of inherited mental illness in that family which apparently was passed on to him thorough his mother and father because they shared a genetic heritage."
Dr. Henry Dee met with Cox in 2003 and conducted a number of neuropsychological tests, including the Wechsler Scale, the Dinman Neuropsychology Memory Scale, and the Wisconsin Card Sorting Test. Dr. Dee agreed with Dr. Berland that Cox's capacity to conform his conduct to the law was substantially impaired. Dr. Dee testified that the Wisconsin Card Sorting Test is designed to identify lesions in the frontal lobe, which is the part of the brain that identifies flexibility in mental functioning as well as the availability to develop plans and follow them or to restrain one's behavior. According to Dr. Dee, his performance on this test was "grossly defective," and, therefore, his mental flexibility was "grossly impaired." Dee testified that Cox has an IQ of 89, and the fact that his memory quotient was 78, more than ten points lower than his IQ, indicated "significant impairment of general mental functioning."
Dr. Dee noted that Cox's performance was consistent with someone who has suffered brain injury because the "most general two sequela of . . . any kind of brain injury are impaired memory and increased irritability and impulsivity." Dr. Dee concluded that Cox operated with these mental deficiencies at the time of the crime because he knew of "no evidence of any kind of neurological disease or impairment that [Cox] has shown that could have been acquired while in prison, so that it seems to have been present at least at the time of this crime and probably extends back to his childhood." Dee concluded that even though DOC investigators interviewed Cox after the homicide and did not perceive any mental illness, Dee's confidence in his diagnosis was not reduced because "the investigators who did the interviewing weren't trained to elicit information about this kind of problem."
Dr. Dee concluded that the additional information gleaned from witnesses allowed Dr. Berland to diagnose Cox with a more serious form of depression than that diagnosed by Dr. McMahon during the penalty phase. Dr. Dee further agreed with Dr. Berland's assessment that Cox had demonstrated psychotic thinking at various points in his life. At the same time, on cross-examination, Dee acknowledged that he did not have any serious disagreements with Dr. McMahon's testimony during the penalty phase. Further, Dee conceded that in prior testimony, he had concluded Cox was not psychotic at the time of the crime, and he testified during the evidentiary hearing that his opinion has not changed.
In response to this evidence, the State relied on Dr. McMahon, the psychologist who testified during the penalty phase of the underlying trial. Dr. McMahon testified that when she met with Cox in 1999 and 2000, he never mentioned that he had been dragged by a mule and knocked unconscious. According to Dr. McMahon, *361 Cox never reported to her that he had experienced hallucinations, and that when she met with him, he had good contact with reality. Dr. McMahon stated that she had reviewed the additional interviews of witnesses that had been collected by the CCRC investigator, and when she met with postconviction counsel, she informed them that her opinion had not changed. According to McMahon, "I felt that the material in some cases some people had buttressed what my previous opinion had been and other, much of the material seemed to be contradictory, one person to another. They were all concerning [Cox] back prior to age 18, at least, so the extent to which it impacted my opinion of him at the present time or in '99 was minimal." She elaborated, "I am not going to rely on what a lay witness tells me somebody was doing twenty years ago to decide whether or not somebody has a mental illness today, particularly when I've got test data and my own interview which I consider much more valid data. . . ."
Dr. McMahon testified that she disagreed with Berland's opinion that Cox is psychotic and was psychotic at the time of the crime. She expressed her belief that, with the exception of paranoia, there was a great deal of inconsistency between witness statements as to the symptoms of psychosis that Cox purportedly exhibited.[12] As an example, McMahon stated that only one witness reported hearing Cox talking to himself, while seven other witnesses denied ever observing this symptom. She disagreed with Dr. Berland's explanation for the low reporting of such symptoms: "Dr. Berland's response to that is, well, he was careful enough that he wasn't doing it around them. That's probably one explanation but to say that something exists and if you don't see it, it's because it's being covered up is to go beyond your data. . . ."
Defense counsel began investigating potential mitigation when first retained to represent Cox. He obtained Cox's medical history from DOC in June or July of 1999 because he knew that Cox was housed in a prison for inmates with psychiatric problems and that Cox was taking medication. During July of 1999, he retained Dr. Berland; however, Berland later wrote a letter stating that his workload was too heavy and he could not assist in Cox's defense. Thereafter, counsel retained Dr. McMahon and provided her with copies of all medical records, deposition transcripts, the investigation report, a forensic assessment that was completed by Cox, and counsel's notes. McMahon reviewed these documents to decide whom she would contact, and she also interviewed Cox. When McMahon explained the mitigation found and "what made Allen tick," counsel did not find anything upon which to base any disagreement.
The forensic assessment form completed by Cox disclosed that Cox stated that he injured his foot in a motorcycle accident, but did not mention anything about a head injury. On the form, Cox had no symptoms of nausea, vomiting, or audiovisual hallucinations. Cox did not list any hospitalization or outpatient contacts for mental disturbances, neurological problems, or head injuries. Finally, although Cox reported on the form that he smoked marijuana, he also wrote that he did not consider himself to be a drug abuser. Based on *362 discussions with McMahon and Cox, defense counsel was not aware that there were any statutory mental health mitigators that could be proven.
Defense counsel did not initially travel to Kentucky to meet with members of Cox's family because Cox did not want anyone to contact them. Cox's reluctance delayed the investigation for mitigation, but counsel did not want to cause his client harm or Cox to mistrust him. He eventually convinced Cox that it was necessary to contact family members. Counsel did travel to Kentucky and visited the impoverished area where Cox was raised, took photographs, and traveled around with the father, Ray Cox, in an attempt to meet other individuals who could potentially provide background information about Cox's life.
Counsel's strategy was to pick who he considered to be the three strongest witnesses to testify during the penalty phase because he was concerned that if he presented a large number of witnesses, the jury would lose focus and interest. Stone first selected Cox's grandmother, Hazel, because Cox had a very close relationship with her. He also hoped that because Hazel was elderly, she might be able to convey something to the jury and help in saving Cox's life. He next selected Elizabeth Veatch, Cox's sister, because she was also a victim of the physical and psychological abuse suffered at the hands of Cox's mother, Barbara. Finally, Stone selected the father, Ray Cox, with the hope the father would be "man enough" to admit that he neglected Cox, and could further describe the tumultuous relationship between the parents. Counsel decided that he would not present Teresa Morgan, one of Cox's ex-girlfriends, because it was his impression that their relationship was "stormy." He was concerned that, "depending on how brutal the involvement" may have been, Morgan might testify in a manner consistent with Bonnie Primeau, the woman Cox kidnapped and raped in 1989.
Deficiency of Performance
Cox has failed to demonstrate that the performance of defense counsel fell "outside the broad range of reasonably competent performance under prevailing professional standards." Maxwell, 490 So.2d at 932. Indeed, a review of the postconviction record demonstrates that defense counsel engaged in all reasonable steps necessary to investigate and develop mitigation for the penalty phase of the trial. As noted above, he retained Dr. Berland as soon as he obtained the necessary medical records. Within three days of being informed that the first expert was too busy to evaluate Cox, he retained Dr. McMahon, a forensic psychologist with over twenty years experience. McMahon spent thirteen hours with Cox, reviewed a plethora of documentation with regard to his mental health, and performed a battery of tests. Although Dr. McMahon ultimately concluded that the statutory mental health mitigators were not applicable to Cox, this Court has repeatedly emphasized that a reasonable investigation into mental health mitigation "is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert." Asay v. State, 769 So.2d 974, 986 (Fla.2000); see also Davis v. State, 875 So.2d 359, 371 (Fla.2003) ("Trial counsel was not deficient where the defendant had been examined prior to trial by mental health experts and the defendant was simply able to secure a more favorable diagnosis in postconviction.") (citing Asay).
We conclude that defense counsel was not deficient with regard to the timing of meeting with the family because any delay was due to the fact that Cox had informed *363 defense counsel that he did not want his family involved. See generally Rodriguez v. State, 919 So.2d 1252, 1263 (Fla.2005) (finding counsel not ineffective for failure to investigate where defendant did not wish to involve his family and concluding that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions" (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052)). A strategic decision was made that the client's wishes would be honored because counsel wanted to establish a relationship in which Cox had full trust. Upon receiving permission from Cox to speak with family members, counsel proceeded to Kentucky. He then accompanied Cox's father in an attempt to investigate the area where Cox was raised and to contact witnesses who might be able to offer mitigating evidence.
Further, counsel was not deficient for failing to investigate or provide Dr. McMahon with information about head injuries or mental illness suffered by Cox because the medical records from the motorcycle accident did not indicate that Cox suffered any type of head injury. Further, Cox did not seek medical treatment after the mule incident so there was no documentation with regard to whether or how seriously he was injured. Finally, Cox neither informed counsel that he had suffered head trauma nor reported any symptoms indicative of head injury or mental illness. See generally Sims v. Singletary, 155 F.3d 1297, 1316 (11th Cir.1998) ("Counsel cannot be deemed deficient for failing to present additional evidence of mitigation of which they were unaware. . . ."). Finally, even though counsel could have presented additional witnesses to offer evidence in mitigation, he made a strategic decision to limit the number of witnesses so the jury would not lose interest. He also decided not to present the testimony of witnesses who could potentially present harmful information about Cox. See Occhicone v. State, 768 So.2d at 1048 ("Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."). Cox has failed to demonstrate that counsel's performance was deficient. Even if we were to assume deficient performance, we conclude that there is no prejudice.
Prejudice
In assessing prejudice, this Court reevaluates the evidence in aggravation against the totality of the mental health mitigation presented during the postconviction evidentiary hearing to determine whether its confidence in the outcome of the penalty phase trial is undermined. See Rutherford v. State, 727 So.2d 216, 223 (Fla.1998) (stating that in assessing prejudice "it is important to focus on the nature of the mental mitigation" now presented). Having reviewed the evidence presented during the postconviction hearing, we conclude that Cox was not prejudiced by counsel's failure to present this testimony for three reasons.
First, although Dr. Berland testified that witnesses reported that Cox had exhibited symptoms of psychosis, Dr. McMahon opined that there was a total lack of consistency and concordance between the witness reports. She further noted that Dr. Berland's report at times did not accurately reflect the witnesses' statements.[13] Additionally, Dr. McMahon testified that she did not believe Cox suffered from any psychosis, and Dr. Dee similarly expressed *364 the opinion that Cox was not psychotic at the time of the crime. Dr. McMahon's conclusions are buttressed by DOC mental health reports on Cox that were prepared immediately before and after the murder. Cox was seen by Dr. Nora Cutillar three days before the murder, and her report stated that Cox's affect was "appropriate" and he denied audiovisual hallucinations and suicidal or homicidal ideations. Three days after the murder of Baker, Cox was seen by psychologist Dr. Joel Kelly, and his report indicated that Cox was alert and well oriented and his affect was appropriate. Finally, Cox was seen by a psychiatric specialist two days after the murder, and her report indicated that Cox was well oriented, he denied audiovisual hallucinations, and he was reluctant to comment about suicidal ideation.
Second, although Dr. Berland testified that Cox's purported head injuries likely exacerbated his mental illness, the evidence of whether Cox actually suffered head trauma and, if so, how severe was very equivocal. With regard to the motorcycle accident, Cox informed Berland that he did not lose consciousness during the accident, nor did he experience nausea or vomiting. Cox also stated that he was wearing a helmet. Further, the hospital records for Cox did not mention a head injury or any loss of consciousness. With regard to the mule incident, even though Berland testified that Cox was knocked unconscious for "apparently several hours," Ray Cox, who was present during the incident, testified that Cox was "just addled." Again, Cox denied to Berland that he experienced nausea, vomiting, or headaches after this incident. Finally, with regard to the incident in which Cox was allegedly struck with a bottle, Berland testified that he learned about it from a summary of an interview conducted by the CCRC investigator, but he never actually verified the incident with a witness.
Finally, with regard to the failure to call additional witnesses during the penalty phase, evidence was presented during the penalty phase demonstrating that (1) Cox grew up in an unstable environment with a physically and emotionally abusive mother who abandoned him, a father who neglected him, and a grandmother who failed to discipline him, (2) his parents were related to each other, and there was a history of mental illness in his family, (3) Cox attempted suicide when he was a teenager, and (4) Cox was severely injured in a motorcycle accident when he was a teenager. Although Kathy Null and Betty Gilbert may have been able to provide more detailed testimony with regard to the abuse that Cox suffered and observed during formative years, Cox has failed to demonstrate that he was prejudiced by counsel's failure to present cumulative evidence. See Maxwell, 490 So.2d at 932 ("It is highly doubtful that more complete knowledge of appellant's childhood circumstances, mental and emotional problems, school and prison records, etc., would have influenced the jury to recommend or the judge to impose a sentence of life imprisonment rather than death.").
In light of the foregoing, we reject this claim that counsel was ineffective during the penalty phase.

II. Newly Discovered Evidence
During the evidentiary hearing, former inmate Henry Wheeler testified that while he was incarcerated at Tomoka Correctional Institution, he and Vincent "Pig" Maynard spoke about the killing of Baker. According to Wheeler, Maynard told him that he (Maynard) had obtained two shanks, given one to Cox, and retained the other. Maynard told Wheeler that he had coerced Cox to attack Baker after giving Cox homemade wine and Sinequan, a psychiatric medication. Maynard told Wheeler that when Cox and Baker began to fight:

*365 [Cox] stuck the man in the hip two or three times. He said that man had been stabbed four times, and he said that Allen Cox stuck him three times in the hip area. I said "Well," I said, "Pig, I thought you said the man was stuck four times," and he looked up at me, he's a skinhead, he looked up at me like, you know, with a devious smile and that's all that was said.
Cox contends that Wheeler's testimony constitutes newly discovered evidence that Maynard was the person who delivered the fatal stab wound to Baker, and his conviction should be set aside pursuant to Jones v. State, 709 So.2d 512 (Fla.1998). We disagree. Our decision in Jones dictates that for a conviction to be set aside based on newly discovered evidence, two requirements must be met:
First . . . the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence."
Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.
Jones, 709 So.2d at 521 (citation omitted) (quoting Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324-25 (Fla.1994)). We conclude that Wheeler's testimony does not satisfy either of these requirements. During trial, Dr. Pillow testified that Baker had been stabbed three times. Cox, 819 So.2d at 709. Thus, to the extent Maynard claimed that Baker had been stabbed four times, he was incorrect. Further, to the extent that Maynard stated that Cox stabbed Baker three times (albeit in the hip), this number of stab wounds is consistent with the evidence presented at trial. Thus, these aspects of Maynard's testimony do not constitute newly discovered evidence.
Moreover, a review of Wheeler's testimony demonstrates that Maynard did not admit that he stabbed Baker. Rather, the only aspect of newly discovered evidence that resulted from this encounter between Maynard and Wheeler was Maynard's "devious" smile when Wheeler asked him about the fourth stab wound. We conclude that something as enigmatic as a grin, no matter how devious it is perceived to be, does not constitute evidence "of such nature that it would probably produce an acquittal on retrial." Jones, 709 So.2d at 521. Therefore, Cox is not entitled to relief on this claim.

PETITION FOR WRIT OF HABEAS CORPUS
Claims of ineffective assistance of appellate counsel are appropriately raised in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). This Court has held that "[i]f a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Rutherford v. Moore, 774 So.2d 637, 643 (Fla. 2000) (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).
*366 In Nixon v. Singletary, 758 So.2d 618 (Fla.2000), this Court initially held that when counsel concedes the guilt of a defendant and the defendant has not affirmatively consented to that concession, counsel is per se ineffective because counsel has failed to "subject the State's case to meaningful adversarial testing." Id. at 622-23. Although the United States Supreme Court later held that the effectiveness of counsel for conceding the guilt of a client is to be evaluated under the Strickland standard, see Florida v. Nixon, 543 U.S. 175, 189, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), Cox asserts that appellate counsel was ineffective for failing to raise a Nixon violation on direct appeal because this Court's decision in Nixon v. Singletary was the law applicable to the case at that time, although later overturned by the High Court.
In affirming the trial court's denial of Cox's rule 3.851 motion, we have held that defense counsel did not concede Cox's guilt during opening statements. Accordingly, Cox's appellate counsel cannot be deemed ineffective for failing to contend on appeal that Cox was deprived of a meaningful adversarial testing of his criminal case due to a concession of guilt. See Rutherford, 774 So.2d at 643. Therefore, this claim for habeas relief is without merit.

CONCLUSION
For the foregoing reasons, we affirm the trial court's denial of the rule 3.851 motion and deny this petition for writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurs with an opinion, in which ANSTEAD, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurring.
I concur in the majority opinion, and write only to commend the trial court for providing this Court with a thorough and well-analyzed order denying postconviction relief. The trial court's thirty-eight-page order contains meticulous detail with record citations, reviews each point raised by the defendant, and explains the trial court's reasoning for rejecting each claim. As to the credibility of the expert witnesses, rather than simply stating which expert the trial court found more credible, the trial court provides a detailed explanation of its basis for assessing credibility. Because we defer to the trial court's factual findings, and because the stakes are so high in death penalty cases, this type of detailed order from the trial court greatly assists the Court's review.
ANSTEAD, CANTERO, and BELL, JJ., concur.
NOTES
[1] Cox was also charged with committing a battery within a detention facility (based on his attack of Wood). Cox, 819 So.2d at 709. On appeal, this Court noted that "[b]ecause the appellant pled guilty to the battery charge prior to his trial and raises no claims regarding the charge or related sentence, we do not discuss it further." Id. at 709 n. 1.
[2] Ray was scheduled to testify in person, but he fled the State of Florida during Cox's trial.
[3] Cox alleged that (I) counsel conceded his guilt during opening statements without obtaining an express waiver from him, and, as a result, he was deprived of meaningful adversarial testing as mandated by United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); (II) counsel was ineffective during the investigative, guilt, and penalty phases under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in the following ways: (a) failing to object to statements made and questions asked by the prosecutor during voir dire and by conducting incomplete and cursory voir dire; (b) conceding guilt during opening statements; (c) failing to object to the State eliciting opinions from the medical examiner that did not meet the standard for admissibility under Florida law; (d) failing to obtain an independent expert to review and testify to the opinions stated by the medical examiner; (e) failing to properly cross-examine the medical examiner; (f) questioning witness Vincent Maynard in a manner that led to the introduction of inadmissible evidence; (g) failing to investigate and present evidence of a pattern of threats and intimidation utilized by State investigators at Lake Correctional Institution; (h) failing to adequately investigate potential witnesses who could have corroborated that Maynard fatally stabbed Baker; (i) failing to investigate information provided by Cox that incarcerated State witnesses received favorable treatment as a result of their testimony against him; (j) failing to adequately investigate potential mitigation evidence for use during the penalty phase; and (k) failing to present available mitigating evidence during the penalty phase and the hearing held pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993). Under this claim, Cox also alleged that counsel's cumulative errors presented a reasonable probability that the result of his trial would have been different, sufficient to undermine confidence in the outcome; (III) the court-appointed psychologist failed to conduct the appropriate tests for organic brain damage and mental illness; (IV) counsel was ineffective for failing to litigate the following constitutional challenges to Florida's sentencing structure in general, and Cox's death sentence in particular: (a) Florida's structure violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (b) the jury impermissibly renders only an advisory sentence; (c) the jury is not required to reach a verdict on the aggravating circumstances found; (d) Florida does not require a unanimous jury verdict to recommend a death sentence; and (e) the elements of the offense necessary to establish capital murder were not charged in Cox's indictment; and (V) counsel's cumulative errors deprived Cox of a fair trial.
[4] "Venezuela" was a nickname for inmate Baker.
[5] Defense counsel testified that the defense interviewed somewhere between twenty-five and forty inmates who had witnessed the fight.
[6] In concluding that Cox was not prejudiced by Dr. Pillow's testimony, the trial court noted in its order that "the State told the jury that it was possible that this was not the murder weapon."
[7] The exchange between counsel and Maynard immediately preceding Maynard's statements regarding the life sentences is as follows:

Q: Now, on July 22nd 1999, you talked with me, Mr. McCune, and Mr. Gross, that is what you said, "I never saw him hit him in the side, I saw him hit him two times in the ass."
A: Sure, that's the first time you were present, sir.
Q: Neither of those statements are exactly protecting Mr. Cox, are they?
A: Well
Q: So don't come in here and tell us
STATE: Objection.
COURT: Sustained.
A: Sir, he has two life sentences already.
COURT: Mr. Maynard, answer his questions, Okay?
[8] Before bringing in the jury, the trial court stated:

Mr. Maynard, before I do get the jury, let me caution you, Mr. Maynard, please answer the lawyer's questions, okay, whether it is Mr. Stone, on behalf of Mr. Cox, or one of the State Attorneys, answer their questions carefully. Okay? I don't want us to get in a situation where I get argued with about a mistrial. Okay?
[9] Testimony at the evidentiary hearing indicated that Wheeler had approximately eleven felony convictions.
[10] In this claim (as well as others), Cox asserts that defense counsel failed to meet the minimum requirements for death penalty co-counsel outlined in the ABA guidelines and Florida Rule of Criminal Procedure 3.112, and we should consider this fact in evaluating whether Cox received effective representation during his trial. Although it is true that one attorney did not meet the minimum standards for co-counsel in capital cases at the time he represented Cox, this does not amount to per se ineffective assistance of counsel. The comment to rule 3.112 demonstrates that the rule was not intended to create an independent cause of action:

These standards are not intended to establish any independent legal rights. For example, the failure to appoint cocounsel, standing alone, has not been recognized as a ground for relief from a conviction or sentence. See Ferrell v. State, 653 So.2d 367 (Fla.1995); Lowe v. State, 650 So.2d 969 (Fla.1994); Armstrong v. State, 642 So.2d 730 (Fla.1994). Rather, these cases stand for the proposition that a showing of inadequacy of representation in the particular case is required. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). These rulings are not affected by the adoption of these standards. Any claims of ineffective assistance of counsel will be controlled by Strickland.
Fla. R.Crim. P. 3.112 Cmt. Accordingly, we analyze the challenges raised by Cox to the effectiveness of his counsel solely pursuant to Strickland.
[11] Ray's wife, Lorain Cox, also testified as to this incident.
[12] Dr. McMahon further noted that even though she had testified during the penalty phase that Cox was suspicious of others, evidencing a paranoid personality, she did not believe he demonstrated symptoms of a paranoid psychosis. Further, to the extent witnesses reported that Cox would hear noises outside his home and become apprehensive, McMahon concluded that this reaction was realistic, as opposed to paranoid, because the police were often looking for him in connection with criminal activity.
[13] For example, even though Dr. Berland's report indicated that four witnesses has observed Cox staring off into space for long periods of time, Dr. McMahon testified that only three witnesses had actually observed this symptom.